UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.   24-cr-10002 |
| v. | Violations: |
| (1) FREDERICK L. SHARP,<br>a/k/a "Bond,"<br>(2) LUIS CARRILLO,<br>a/k/a "Fire," a/k/a "SUSS,"<br>(3) MIKE K.G. VELDHUIS,<br>a/k/a "ACCO,"<br>(4) PAUL SEXTON,<br>a/k/a "HEAR," and<br>(5) COURTNEY M. KELLN,<br>a/k/a "Celt," a/k/a "Esquire,"<br><br>Defendants | Counts One & Two: Conspiracy to Commit Securities Fraud (18 U.S.C. § 371)<br><br>Counts Three & Four: Securities Fraud (15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2)<br><br>Forfeiture Allegation: (18 U.S.C. § 981 and 28 U.S.C. § 2461) |

INDICTMENT

At all times relevant to this Indictment:

General Allegations

Key Persons and Entities

1.      Defendant FREDERICK L. SHARP resided in British Columbia, Canada.  SHARP operated an entity known as Corporate House, which he described as a firm of private investment bankers with offices in Canada and affiliations worldwide.  SHARP used the codename "Bond."

2.      Defendant LUIS CARRILLO resided in Mexico.  CARRILLO previously practiced as a securities attorney in the United States.  CARRILLO used various codenames, including "Fire" and "SUSS" and iterations of "Iceman," "Mamba," and "Spartacus."

3. Defendant MIKE K.G. VELDHUIS resided in British Columbia, Canada. VELDHUIS at times associated himself with an entity known as Venture Capital First LLC. VELDHUIS used various codenames, including "ACCO" and iterations of "Stockman."

4. Defendant PAUL SEXTON resided in British Columbia, Canada. SEXTON used various codenames, including "HEAR."

5. Defendant COURTNEY M. KELLN resided in British Columbia, Canada. KELLN worked for SHARP and utilized the entities Celtic Consultants LLC and Esquire Corporate Services SRL when doing so. KELLN used various codenames, including "Celt" and "Esquire."

6. Roger Knox was a co-conspirator who resided variously in France and Switzerland. Knox was the founder, owner, and chief executive of the asset management firm Wintercap SA, formerly known as Silverton SA ("Wintercap"), based in Switzerland.

7. Richard Targett-Adams was a co-conspirator who resided in France and worked for Knox. Targett-Adams was responsible for several back-office tasks for Wintercap.

8. Co-Conspirator 1 ("CC-1") resided variously in Colombia and Florida. CC-1 at times worked with CARRILLO.

9. Co-Conspirator 2 ("CC-2") resided in California and was the Chairman of the Board of Directors of Vitality Biopharma, Inc., a company described further below.

10. Co-Conspirator 3 ("CC-3") resided in British Columbia, Canada. CC-3 at times worked with VELDHUIS and SEXTON.

11. Co-Conspirator 4 ("CC-4") generally resided in British Columbia, Canada. CC-4 worked for SHARP.

12.    Co-Conspirator 5 ("CC-5") resided in British Columbia, Canada.

13.    Pure Snax International Inc. ("Pure Snax") was a New Jersey-based penny-stock company that described itself as a "wellness brand focused on bringing healthy snacks and foods to consumers." The company was incorporated in Nevada in 2011 under the name B-Maven Inc. Between September 2015 and September 2016, it traded on the over-the-counter securities market under the ticker symbol "PSNX."

14.    Garmatex Holdings, Ltd. ("Garmatex") was a British Columbia-based penny-stock company that was purportedly planning to complete a reverse merger with a private company, Garmatex Technologies, Inc., in or about early 2017. Following the merger, Garmatex would have purportedly commenced operations to "provide performance fabric solutions in virtually every sector that has textile applications." The company was incorporated in Nevada in 2014 under the name Oaxaca Resources Corp. In 2017, Garmatex traded on the over-the-counter securities market under the ticker symbol "GRMX."

15.    OneLife Technologies Corp. ("OneLife") was a "mobile medical data and technologies" penny-stock company based in Illinois. The company was incorporated in Nevada in 2014 under the name Oculus Inc. In late 2017 and 2018, it traded on the over-the-counter securities market under the ticker symbol "OLMM." On or about March 2, 2018, the company registered its S-1 shares with the SEC under Section 12 of the Securities Exchange Act of 1934 (the "Exchange Act").

16.    Vitality Biopharma, Inc. ("Vitality") was a biopharmaceutical penny-stock company based in Los Angeles that focused on the development of cannabinoids. It was incorporated in Nevada in June 2007 under the name Legend Mining Inc. Between in or about

2012 and mid-2016, Vitality was known as Stevia First Corp. and was a biotechnology company focused on products involving stevia, a sugar substitute. Vitality traded on the over-the-counter market under the ticker symbol "VBIO" and, before that, "STVF." Vitality's common stock was registered with the SEC under Section 12 of the Exchange Act.

<u>Relevant Entities, Principles, and Definitions</u>

17.     The Securities and Exchange Commission ("SEC") is an independent agency of the executive branch of the United States government responsible for enforcing the federal securities laws and promulgating rules and regulations thereunder. Those laws, rules and regulations are, among other things, designed to protect the investing public by maintaining fair and honest securities markets and eliminating manipulative and deceptive trading practices.

18.     Transfer agents are companies that, among other activities, issue and cancel certificates of a company's stock to reflect changes in ownership, such as when stock is changing hands. Many companies with publicly traded stock use transfer agents to track the ownership of their stock.

19.     Microcap stocks, also known as "penny" stocks, are among the securities that are subject to the federal securities laws. These stocks are, as a general matter, securities of publicly traded companies that have a low market capitalization and a low price per share (frequently, though not always, $1 or less). Microcap stocks are most often traded on the "over-the counter" securities markets, rather than on national exchanges such as the New York Stock Exchange or the NASDAQ Stock Market, and tend to be thinly traded. (OTC Markets Group, Inc. ("OTC Markets") operates the predominant "over-the-counter" securities markets.) In addition, companies that issue microcap stock typically make less information available to the investing

4

public about their operations and performance, although such companies sometimes register their shares with the SEC under Section 12 of the Exchange Act and thereby become subject to certain reporting requirements, such as the filing of annual reports with the SEC.  Additionally, large blocks of microcap stock are often controlled by a small number of individuals, which can make it easier to orchestrate manipulative trading in those stocks.

20.     Among the ways that federal securities laws and regulations aim to protect investors are (i) mandating certain disclosures by holders of large quantities of stock registered with the SEC, and (ii) limiting the ability of executive officers, directors, and large shareholders to quickly sell significant amounts of their stock (regardless of whether it is registered with the SEC) in the open market.

21.     For example, when a person or group of persons acquires beneficial ownership[1] of more than five percent of a voting class of stock registered with the SEC, the person or group is required to file a Schedule 13D with the SEC disclosing such ownership and setting forth background information about the owner(s) and their investment intentions.  As part of their compliance programs, brokers often ask individuals seeking to deposit shares in microcap stocks whether they own or control more than five percent of the issuer's shares.  OTC Markets also requires public companies to disclose shareholders who own five percent (or more) of their shares, in order to meet certain listing requirements.  In addition, under Section 16 of the Exchange Act, officers, directors, and persons who acquire beneficial ownership of more than ten percent of a public company's stock registered with the SEC are also required to disclose in public SEC filings

---

[1] A beneficial owner is any person who directly or indirectly has (or shares) voting or investment power, which includes the power to sell or direct the sale of a security.

the number of shares they beneficially own, as well as any changes to that number as they acquire or sell shares, on SEC Form 3 ("Initial Statement of Beneficial Ownership of Securities") and SEC Form 4 ("Statement of Changes in Beneficial Ownership"), respectively.

22.    Similarly, control securities—which are securities owned by a person who directly or indirectly controls the issuer, either alone or as a member of a control group—are subject to Rule 144 of the Securities Act of 1933 ("Rule 144") [17 CFR § 230.144]. The term "affiliate" is used to describe such a control person or group, and persons or groups holding more than 10 percent of a company's stock are generally deemed to be affiliates. In the context of securities traded "over-the-counter"—such as most microcap stocks—Rule 144 provides that an affiliate cannot sell more than one percent of the issuer's total outstanding shares in any three-month period. Rule 144 was enacted to "implement the fundamental purposes" of the Securities Act of 1933, namely to "provide full and fair disclosure of the character of the securities sold in interstate commerce ... and to prevent fraud in the sale thereof." 37 Fed. Reg. at 596. As part of their compliance programs, brokers often ask individuals seeking to deposit shares of microcap stocks whether they are officers, directors, ten percent shareholders, or otherwise affiliates of the issuer.

23.    Rule 144 also places certain restrictions on the selling of so-called "restricted" securities. Such shares, which are acquired directly from issuers and are not registered with the SEC, generally cannot be sold to the public and bear a legend indicating that they are "restricted." Shares that are registered with the SEC, and that do not bear a legend indicating they are restricted, are considered "unrestricted" or "free-trading," and may be sold in the market by non-affiliates. Rule 144 also identifies circumstances in which a shareholder holding restricted shares can have the legend removed, enabling the shares to become free-trading. One such circumstance is if the

shareholder is a non-affiliate and has held the shares for a certain period of time, typically either six months (if the company's shares are registered under Section 12) or one year (if the company's shares are not so registered).

24.     The total number of unrestricted securities deposited with brokers and available for trading is known as the "float."  For example, if hypothetical company Acme Corporation issued 10 million shares, but only one million were unrestricted and deposited with brokers (and thus available to be traded), the "float" would be one million shares.  The remaining nine million shares might be a mix of restricted shares and unrestricted shares not yet deposited with any broker.  Like individuals who control greater than ten percent of a company's total outstanding shares, individuals who control a majority of a company's float are also likely to be control persons and, therefore, affiliates for purposes of Rule 144.

25.     One form of fraud that occurs in the market for microcap stocks is a "concealed control" scheme.  Such a scheme typically involves individuals (or groups of individuals) acquiring and exercising control over a significant portion of an issuer's shares, and often a majority of an issuer's float, while concealing their affiliate status.  After acquiring a large portion of the issuer's free-trading shares, the individual or group will typically distribute those shares among accounts held in the names of "nominees"—including sham entities and other third parties—to help conceal their identities as the true owners of the stock.  In so doing, the perpetrators seek to avoid and circumvent the restrictions in the securities laws discussed above, as well as the controls put in place by brokerages selling the stock.  The perpetrators then sell their shares via the nominees to the unsuspecting public in contravention of the securities laws.  The

proceeds from such sales are often then funneled back to the perpetrators or to third parties at the perpetrators' direction.

26.     Concealed control schemes are often accompanied and supported by stock manipulation in the form of "pump-and-dumps." A "pump-and-dump" typically involves an effort to artificially inflate the stock price or trading volume of a publicly traded company (the "pump") so that individuals who control a substantial portion of the company's float can sell their shares at artificially high prices, or in a more liquid market, to other investors (the "dump"). Typically, such schemes involve the use, among other means, of news releases, email blasts, and other forms of promotion—often containing false or exaggerated information—to inflate the stock price and trading volume and to generate demand for the shares. Such schemes also at times employ "boiler rooms," wherein multiple individuals work in a coordinated effort to contact potential investors, often through unsolicited "cold calls," and provide false, misleading, unfounded, and/or exaggerated information about the company in order to induce potential investors to purchase shares.

<u>Overview of the Conspiracies and the Schemes to Defraud</u>

27.     Between in or about 2012 and in or about July 2020, the defendants conspired variously with one another, and with others known and unknown to the Grand Jury, to commit securities fraud by orchestrating and participating in sophisticated pump-and-dump schemes involving the concealed control of securities of several microcap companies. The schemes netted at least tens of millions of dollars in illicit proceeds at the expense of the investing public.

28.     The defendants played different roles in the conspiracies and the schemes to defraud, as follows:

8

a.  SHARP operated a sophisticated platform that provided a variety of services to control persons seeking to conceal their identities when selling large quantities of penny-stock companies' shares in contravention of the securities laws.  In exchange for fees, the array of services SHARP offered included (i) forming and providing offshore nominees to hold shares for undisclosed control persons; (ii) providing and administering encrypted communications networks for use by control persons and other co-conspirators (known as the "xphone" and "xmail" systems); (iii) facilitating the deposit of stock with Wintercap in blocks of less than five percent via SHARP's nominees; (iv) administering a proprietary web-based accounting system that tracked clients' total stock holdings, sales, and proceeds (known as the "Q" system); and (v) facilitating the payment of illegal stock sale proceeds to accounts around the world at control persons' directions, including through the use of fake invoices that concealed the true nature of the payments.  In or about July 2013, SHARP described his service as follows:  "The service provided is comprehensive; it is not limited to trading.  It includes pyaments [sic], loans, private placements and keeping clients out of jail."

b.  CARRILLO was an undisclosed control person who, either alone or as part of an undisclosed control group, used SHARP's platform and Wintercap to deposit and sell large quantities of shares of penny-stock companies through nominees and to then distribute the illicit proceeds for CARRILLO's benefit. CARRILLO organized promotional campaigns, including boiler rooms, to

facilitate pump-and-dumps of the stocks he controlled. The account name for CARRILLO's account in the Q system was "SUSS."

c.  VELDHUIS and SEXTON were undisclosed control persons who—together with each other and with CC-3 (the "VELDHUIS Control Group")—used SHARP's platform and Wintercap to deposit and sell large quantities of penny-stock companies' shares through nominees and to then distribute the illicit proceeds for their benefit. The VELDHUIS Control Group also organized promotional campaigns to facilitate pump-and-dumps of the stocks they controlled. The VELDHUIS Control Group also at times worked with, and shared proceeds with, CC-2, and SEXTON was CC-2's primary point of contact. The account names for VELDHUIS's and SEXTON's accounts in the Q system were "ACCO" and "HEAR," respectively.

d.  KELLN worked for SHARP and facilitated the use of SHARP's platform by undisclosed control persons—including CARRILLO and the VELDHUIS Control Group—by preparing and/or obtaining false and misleading documents that were provided to transfer agents and brokers to facilitate the breakdown, transfer, and deposit of the undisclosed control persons' shares in nominees' names in blocks of less than five percent. KELLN used email accounts in the nominees' names when sending formal documents to effectuate the transfers and deposits but used encrypted messaging systems and codenames when discussing the breakdown of shares with Wintercap and/or the control persons. KELLN closely monitored the five percent threshold and ensured that no one

10

nominee formally owned more than five percent of a company's stock at any point in time, even though the undisclosed control persons secretly did own and control more than five percent.

29.    The conspiracies and schemes to defraud involved the following general pattern:

a.  First, the control persons (*i.e.*, CARRILLO or the VELDHUIS Control Group) acquired control over a significant portion, if not all, of a penny-stock issuer's outstanding shares and a majority, if not all, of the issuer's float. In instances in which the companies' shares were registered with the SEC under Section 12 of the Exchange Act, the control persons failed to file any of the required disclosures reflecting (i) their ownership of greater than five and/or ten percent of the companies' outstanding shares and (ii) changes in their ownership as they sold shares.

b.  Second, the control persons transferred their unrestricted stock to nominee entities controlled by SHARP or by the control person(s) themselves. While the nominee entities were officially owned by third-party individuals (the supposed "beneficial owners"), in reality the control persons retained control over the shares. These transfers were typically made in blocks of less than five percent of the total outstanding shares of the issuer in order to evade and circumvent the securities laws and to evade scrutiny by brokers. KELLN often facilitated these transfers.

c.  Third, the control persons, often acting through KELLN, then arranged to transfer the shares from each nominee entity to Wintercap, ostensibly on behalf

of each separate nominee.  In reality, all of the shares transferred to Wintercap remained under the control persons' control and Knox and Targett-Adams took direction from the control persons (and from SHARP and KELLN for nominees on SHARP's platform) rather than from the nominees' purported beneficial owners.

d.  Fourth, Knox and Targett-Adams arranged to deposit the stock into accounts in Wintercap's name with multiple brokerage firms around the world.  Knox often sent each nominee entity's shares to a different broker, thereby giving the false appearance that each nominee entity was a separate client with its own individual position of less than five percent of the issuer's outstanding shares. By formally staying below five percent, Knox assisted the control persons in evading disclosure obligations and sought to avoid triggering direct inquiries and potential rejections by the brokerage firms.  Knox also often provided false and/or misleading representations to the brokers indicating that the stock was not beneficially owned or controlled by control persons and/or affiliates of the issuer.  Knox's general policy was to not hold greater than 20 percent of any one issuer's total outstanding stock at any point in time; however, Knox was willing to and did "re-load" positions for control persons—that is, to bring their holdings back up to 20 percent—as Knox sold their stock.

e.  Fifth, through Wintercap's brokerage accounts, Knox and Targett-Adams then dumped—*i.e.*, sold—the control persons' stock into the securities markets to unsuspecting investors at the direction of the control persons.  The "dump"

phase of the scheme typically corresponded with a promotional campaign funded by the control persons to generate public interest in the stock, which often artificially inflated the market price of the stock. Knox and Targett-Adams typically took direction from the control persons over encrypted messaging systems using codenames regarding when and how much stock to sell.

f.   Sixth, following the "dump," Knox swept the stock sale proceeds from the brokerage accounts into Wintercap's bank accounts. Wintercap then retained a small portion of the proceeds as Wintercap's fees and distributed the remainder of the proceeds at the control persons' direction, including for the control persons' personal benefit and to support the scheme. Before transferring proceeds, Knox required the control persons to provide Wintercap with documentation purporting to support the transfers. Often, Wintercap received (and thereafter maintained) fake invoices from CC-4 describing services purportedly provided to the nominees that were never, in fact, rendered.

<u>Object and Purpose of the Conspiracies and the Schemes to Defraud</u>

30.   The object of the conspiracies and the schemes to defraud was for the defendants and their co-conspirators to commit securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and attendant regulations. The principal purpose of the conspiracies and the schemes to defraud was for the defendants and their co-conspirators to make money by selling large quantities of penny-stock companies' shares in more liquid markets and/or at

artificially inflated prices while concealing their identities and actions from investors, regulators, and law enforcement.

<u>Manner and Means of the Conspiracies</u>

31.    Among the manner and means by which the defendants and their co-conspirators known and unknown to the Grand Jury carried out the conspiracies were the following:

    a.    Distributing free-trading shares of various penny stock companies among several nominees to disguise the fact that the shares were controlled by control person(s) acting alone or as part of a group;

    b.    Transferring the shares from the nominees to Wintercap, which in turn deposited the shares with brokers, including at times based on false and/or misleading representations;

    c.    Concealing from transfer agents, brokers, and the investing public that the shares held by the nominees and deposited by Wintercap were secretly controlled by the control person(s), including by failing to make required disclosures under the securities laws and applicable regulations;

    d.    Engaging in promotional campaigns in Massachusetts and elsewhere to artificially boost the securities' share prices and trading volumes;

    e.    Secretly selling the shares from Wintercap's accounts during the promotional campaigns in contravention of the federal securities laws and regulations governing the sale of stock by affiliates;

f.  Distributing the proceeds from the stock sales for the benefit of the control persons or to third parties at the control persons' direction, including to stock promoters;

g.  Using proprietary accounting systems, including the Q system, to track the control persons' stock holdings, the stock sales and the proceeds generated therefrom, and the distribution of the proceeds; and

h.  Taking steps designed to conceal their actions and to avoid discovery by regulators and law enforcement, including by using encrypted and/or private communications networks and messaging systems, using codenames, and making false statements to regulators when asked about aspects of the schemes.

<u>Overt Acts in Furtherance of the CARRILLO Conspiracy and Scheme to Defraud</u>

32.     On or about various dates between 2014 and approximately November 2018, the defendants CARRILLO, SHARP, and KELLN, together with others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in furtherance of the CARRILLO conspiracy and scheme to defraud:

*Pure Snax International Inc. (PSNX)*

33.     In two transactions in or about May 2013 and in or about September 2014, KELLN caused 1.2 million free-trading PSNX shares (which at the time bore the symbol BMAV) to be transferred from five PSNX shareholders to two nominees under SHARP's control. Following a subsequent forward stock split by Pure Snax in June 2015, and the cancellation of 300 million shares by the company's President and CEO in September 2015, the two SHARP nominees

together controlled 48 million PSNX shares, which represented approximately 48 percent of Pure Snax's total outstanding shares.

34.     In two transactions in or about September 2014 and in or about July 2015, KELLN, Knox, and Targett-Adams caused 19.6 million PSNX shares (on a post-split basis) to be transferred from two different SHARP nominees to Wintercap, which deposited the shares for trading.  The shares deposited with Wintercap represented close to 20 percent of Pure Snax's total outstanding shares and over 40 percent of Pure Snax's float.

35.     On or about November 25, 2015, CARRILLO sent an xphone message to SHARP stating that CARRILLO and a co-conspirator were "starting psnx next week" and asking if they could "trade directly" with Wintercap.  SHARP responded "Si."

36.     Thereafter, between in or about November 2015 and on or about September 30, 2016, Wintercap, at the direction of CARRILLO and/or one or more co-conspirators, sold nearly all 19.6 million PSNX shares, generating over $1.6 million in illicit proceeds.  Pure Snax's stock price more than doubled between the beginning of March and mid-May 2016 before crashing by the end of September 2016.

37.     During that same period, beginning in or about March 2016, CARRILLO caused CC-1 and other co-conspirators to operate a boiler room from Medellin, Colombia to generate demand for PSNX shares based on exaggerated and false statements about Pure Snax and its growth opportunity.

38.     As part of the boiler room campaign, in or about March and in or about April 2016, CARRILLO caused CC-1 and other co-conspirators to place promotional calls to a prospective

investor in Massachusetts who purchased PSNX shares as a result, as well as to other prospective investors.

39.    In or about April 2016, CARRILLO or a co-conspirator caused Wintercap to wire tens of thousands of dollars to CC-1 and at least one other co-conspirator as compensation for running the boiler room.

*Garmatex Holdings, Ltd. (GRMX)*

40.    In three transactions in or about February and in or about March 2017, KELLN caused 5.25 million free-trading GRMX shares to be transferred from nine GRMX shareholders to three nominees under SHARP's control.  Each block consisted of 1.75 million shares, representing just under five percent of Garmatex's total outstanding shares.  In total, the three blocks represented just under 15 percent of Garmatex's total outstanding shares.

41.    On or about February 13, 2017, just weeks before KELLN caused the first GRMX share transfers to SHARP nominees, Targett-Adams told KELLN in an encrypted message that he had just spoken with CARRILLO, who had said that KELLN would be sending Wintercap documents to facilitate a deposit of GRMX shares.

42.    KELLN responded that same day that she had not yet "got the certs" and that "[a]s soon as I do, we will T it all up."

43.    On or about February 17, 2017, after Targett-Adams asked about the status of the documents and told KELLN that CARRILLO "wants me to try and get this in asap," KELLN responded in an encrypted message, "I have to transfer all the stock to Noms first" and "There is a process."

44.     In or about March 2017, KELLN, Knox, and Targett-Adams caused all 5.25 million GRMX shares held by the SHARP nominees to be transferred to Wintercap, which deposited the shares for trading.

45.     On or about March 9, 2017, during the process of transferring the GRMX shares to Wintercap, CARRILLO asked Knox and Targett-Adams in an encrypted message to get the deposits completed "asap," noting that it was "Urgent so we can have a good month lol."

46.     On or about March 14, 2017, CARRILLO asked Knox and Targett-Adams in an encrypted message to have the first block of 1.75 million shares "ready to go at open - we gonna drop that [expletive]."

47.     On or about March 15, 2017, in connection with Wintercap's deposit of one of the blocks of GMRX shares, Knox made false and misleading written representations to a broker, including that the shareholder did not own five or more percent of Garmatex's shares.

48.     Between on or about March 14, 2017 and on or about May 2, 2017, CARRILLO caused Wintercap to sell over 7.2 million GMRX shares, accounting for approximately 20 percent of Garmatex's total outstanding shares, including by sending sale instructions via encrypted messages.  The 7.2 million shares sold included approximately two million GRMX shares that KELLN, Knox, and Targett-Adams caused to be transferred from SHARP nominees to Wintercap in or about April 2017.  The sales, in total, generated approximately $5 million in illicit proceeds. Garmatex's stock price approximately doubled between mid-March and mid-April 2017, before crashing by June 2017.

49.     During that same period, in or about March and April 2017, CARRILLO orchestrated a multifaceted promotional campaign—including press releases, email blasts, and

telephone calls from a boiler room to prospective investors—to generate demand for GRMX shares.

50.     As part of the promotional campaign, CARRILLO caused an investor relations company to draft press releases that Garmatex published online, including to prospective investors in Massachusetts and elsewhere.

51.     Also as part of the promotional campaign, CARRILLO caused a boiler room to place promotional calls to a prospective investor in Massachusetts who purchased GRMX shares as a result, as well as to other prospective investors.

52.     On or about June 9, 2017, CARRILLO sent SHARP and CC-4 an xmail message regarding the Q accounting system, requesting that they "please transfer the remaining cash balance in GRMX to SUSS [CARRILLO's account in the Q system], and then close the GRMX account please."

*OneLife Technologies Corp. (OLMM)*

53.     In or about September 2016, CARRILLO or a co-conspirator caused approximately 37 of OneLife's 39 total outstanding share certificates (which at the time bore the symbol OCLL) to be physically delivered to Wintercap.  The certificates included a restricted 70-million share certificate issued to the company's sole director and officer, which alone represented approximately 75 percent of OneLife's total outstanding shares at the time.[2]  The certificates also included approximately 36 restricted certificates in the names of different individual investors.

_____

[2] In or about June 2017, the company's shares underwent a two-for-one forward stock split, issuing two new shares for each existing share.  The OLMM share amounts are discussed herein on a post-split adjusted basis.

54.     On or about January 11, 2017, CARRILLO emailed Wintercap to confirm that Wintercap had possession of the share certificates.

55.     On or about January 16, 2017, CARRILLO emailed pre-signed signature pages for share purchase agreements in the names of 35 OLMM investors and told Wintercap that it would receive the physical signature pages the following day, which it did.  In the same email, CARRILLO also sent a template share purchase agreement for OLMM shares in Microsoft Word format, with the purchaser and seller names blank.

56.     In or about February, March, and April 2017, CARRILLO, KELLN, and Targett-Adams discussed how to divide the OLMM investors' shares into blocks of just under five percent of the total outstanding shares:

    a.   As one example, in or about February 2017, Targett-Adams sent CARRILLO an encrypted message noting that he had "allocated the certs into 5 posns of just under 5%."

    b.   In or about March 2017, Targett-Adams emailed CARRILLO a more specific proposed breakdown of the five positions, each just under or equal to five percent.

    c.   CARRILLO responded with directions as to how each should be deposited:  two with SHARP nominees, and three "direct with" Wintercap.

    d.   In or about April 2017, Targett-Adams sent an encrypted message to KELLN, stating that he had "certs for positions of [OLMM]" from CARRILLO that CARRILLO "wants me to send to you/the TA for putting into two bond companies" (*i.e.*, two SHARP nominees).  Targett-Adams identified the two

positions as comprising approximately 4.7 percent and 4.4 percent of OLMM's outstanding stock, respectively.

    e.   KELLN directed Targett-Adams to "Send certs and stock powers to me" and provided her address in British Columbia.

57.    In two transactions taking place in or about June and in or about September 2017, KELLN caused approximately 4.37 million OLMM shares and approximately 4.13 million OLMM shares, respectively, to be transferred from 14 individual investors to two SHARP nominees in free-trading form. The two positions accounted for just under five percent of OneLife's total outstanding shares each.

58.    After KELLN caused the OLMM shares to be transferred to the two SHARP nominees, KELLN, Knox, and Targett-Adams caused each position to be transferred to Wintercap, which deposited the shares for trading.

59.    Also in or about June 2017, Targett-Adams and Knox caused a third position of OLMM shares—totaling approximately 4.67 million shares—to be transferred from eight individual investors to Wintercap in free-trading form, so that Wintercap could deposit the shares with brokerage firms for trading and allocate them to a nominee associated with CARRILLO. In total, Wintercap deposited approximately 13.2 million OLMM shares with brokerage firms, accounting for approximately 14 percent of OneLife's total outstanding shares and approximately 92 percent of its float.

60.    On or about September 11, 2017, in connection with Wintercap's deposit of one of the blocks of OLMM shares, Knox made false and misleading written representations to a broker, including that the shareholder did not own five or more percent of OneLife's shares.

61.     Between in or about late November 2017 and through on or about October 1, 2018, CARRILLO—using selling instructions sent via encrypted messages—caused Wintercap to sell approximately 7.5 million OLMM shares, generating approximately $5.2 million in illicit proceeds.

62.     During this same November 2017 to October 2018 period, CARRILLO directed Wintercap to allocate the proceeds of the OLMM stock sales to particular nominees that he or SHARP controlled.

63.     On or about February 5, 2018, CARRILLO sent an xmail message to CC-4 requesting that a wire transfer in the amount of $100,000 be sent to a Mexican construction company, adding that the wire should be charged to the OLMM account in the Q system.

64.     On or about February 7, 2018, Wintercap sent the requested $100,000 wire from stock sale proceeds allocated to a SHARP nominee.

65.     On or about December 6, 2017, KELLN and Targett-Adams discussed the remaining two five percent blocks, which had not yet been deposited.  Via an encrypted message, Targett-Adams told KELLN, "There are 2 other posns of OLMM still in certs" and proposed that "we can now start to bring [them] in as selling starts."  KELLN responded, "Just send me all the specific details for each [share purchase agreement] you need.  Seller name/purchaser name/date/price/share amount [sic]."  KELLN added "I'll get it done."

66.     In or about January and February 2018, as part of a promotional campaign CARRILLO orchestrated, CARRILLO caused an investor relations company to draft press releases that OneLife published online, including to prospective investors in Massachusetts and elsewhere.

67.     Wintercap paid the investor relations firm from stock sale proceeds allocated to a SHARP nominee.

68.     Also as part of the promotional campaign, in or about September 2018, CARRILLO or a co-conspirator caused an individual to call a prospective investor in Massachusetts to tout OLMM shares, thereby inducing the Massachusetts resident to buy OLMM shares.

69.     On or about October 15, 2018, SHARP sent CARRILLO an xmail message with an account statement for the OLMM account from the Q system that reflected, among other transactions, stock sales that CARRILLO directed through Wintercap.

70.     On or about November 26, 2018, SHARP sent CARRILLO an xmail message with an account statement for CARRILLO's "SUSS" account from the Q system that reflected, among other transactions, an internal transfer of over $21,000 from October 10, 2018 associated with the closure of the OLMM account.

Overt Acts in Furtherance of the VELDHUIS Control Group Conspiracy and Scheme to Defraud

71.     On or about various dates between 2012 and July 2020, the defendants SHARP, VELDHUIS, SEXTON, and KELLN, together with others known and unknown to the Grand Jury, committed and caused to be committed the following overt acts, among others, in furtherance of the VELDHUIS Control Group conspiracy and scheme to defraud:

*Vitality Biopharma, Inc. (VBIO), f/k/a Stevia First Corp. (STVF)*

72.     In or about March 2012, CC-2 and other co-conspirators caused approximately 15.75 million restricted STVF shares to be transferred from CC-2 to seven SHARP nominees (representing approximately 31 percent of the company's total outstanding shares) and an additional approximately 4.23 million restricted STVF shares (representing an additional eight

23

percent) be transferred to two nominees controlled by CC-5. At the time of the transfer, and throughout the conspiracy period, CC-2 was the Chairman of Stevia First, later known as Vitality, and retained a beneficial interest in the shares. CC-2, however, failed to publicly report CC-2's beneficial interest in the shares, as he was required to do under applicable securities laws and regulations.

73.     On or about October 29, 2014, SEXTON sent an xphone message to VELDHUIS, reporting on a discussion between SEXTON and CC-2. SEXTON reported that CC-2 was sharing in CC-5's block of shares and that CC-2 would "prefer if we took the shares in [CC-5's nominees] and sold them all together." VELDHUIS responded, "I think we all agree with that."

74.     In three transactions taking place in or about June 2015, May 2016, and June 2016, KELLN or a co-conspirator caused approximately 1.66 million, 4.9 million, and 5.06 million STVF shares, respectively, to be transferred from a mix of SHARP and CC-5's nominees to Wintercap in the names of three different SHARP nominees in free-trading form.

75.     Beginning no later than in or about May 2016, VELDHUIS or a co-conspirator caused Wintercap to begin selling hundreds of thousands of STVF shares. In or about July 2016, during the period Wintercap was selling STVF shares, the company underwent a one-for-ten reverse stock split (meaning that it replaced every ten existing shares with one new share) and changed its name to Vitality and its stock symbol to VBIO.

76.     Beginning no later than in or about September 2016 and continuing through no earlier than in or about October 2017, VELDHUIS or a co-conspirator caused Wintercap to wire hundreds of thousands of dollars to a media company ("Media Company 1") for the purpose of promoting VBIO to investors.

77.    For example, on or about February 1, 2017, SEXTON or a co-conspirator sent an xmail message to CC-4 requesting that $50,000 be sent by wire transfer to Media Company 1, adding that the wire should be charged to the VBIO account in the Q system.  VELDHUIS responded that same day with the message "approved."

78.    Wintercap debited the media company payments from the accounts of SHARP nominees who were selling VBIO shares on behalf of the VELDHUIS Control Group.

79.    Media Company 1, in turn, arranged for other media companies, including Media Company 2, to draft and publish promotional materials touting VBIO to investors.

80.    Media Company 2, in turn, sent out email blasts touting VBIO, including on or about December 14, 2016 to a prospective investor in Massachusetts who purchased VBIO shares as a result.

81.    Between in or about January and May 2016, SEXTON, with CC-2's knowledge and participation, orchestrated the execution of private securities purchase agreements between Vitality and multiple SHARP nominees.  Pursuant to the purchase agreements, the SHARP nominees initially acquired 2.65 million VBIO shares in aggregate (on a post-split basis), with warrants providing the opportunity to purchase an additional 7.95 million VBIO shares in aggregate (on a post-split basis) over the ensuing six months.  The initial 2.65 million VBIO shares equaled approximately 25 percent of Vitality's then-outstanding shares.  All of the VBIO shares and warrants were under the VELDHUIS Control Group's common control.  Neither VELDHUIS, nor SEXTON, nor CC-3 publicly reported their beneficial interest in the shares as they were required to do under applicable securities laws and regulations.

82.     Beginning in or about October 2016, and on numerous occasions through in or about August 2018, KELLN engaged an attorney to issue opinion letters falsely representing that the SHARP nominees that had purchased VBIO shares were not affiliates of Vitality.

83.     On or about August 7, 2018, in connection with obtaining two such opinion letters for SHARP nominees, KELLN sent an email to KNOX and TARGETT-ADAMS requesting paperwork related to the nominees, which KELLN said she needed in order to "sen[d] … VBIO shares in for legend removal."

84.     Between in or about November 2016 and on or about January 19, 2018, KELLN caused over 8.1 million VBIO shares to be transferred to Wintercap in the names of eight different SHARP nominees.

85.     Wintercap, in turn, deposited each block of shares with a broker, and each transfer and deposit was in an amount under five percent of Vitality's then-total outstanding shares.

86.     In or about February 2017, KELLN recognized that one of the Wintercap deposits would push the SHARP nominee's holdings over five percent based on shares not yet sold by Wintercap in that nominee's name.  KELLN directed Wintercap in an encrypted messages to "Pls make sure to allocate all Vbio sales to [that nominee's] account today. We need to make room for the pending 750k."  KELLN then added, "Again 5% rule is biting me ass."

87.     On or about May 5, 2017, in connection with Wintercap's deposit of one of the blocks of VBIO shares, Knox made false and misleading written representations to a broker, including that the shareholder did not own five or more percent of Vitality's shares.

88.     On or about June 23, 2017, VELDHUIS alerted Wintercap in an encrypted message that "1,800,000 VBIO on its way." Targett-Adams asked if KELLN was "going to send us docs," to which VELDHUIS responded "Yes."

89.     KELLN confirmed that same day in a separate encrypted message that "U will have tons of VBIO coming at you next week."

90.     Later in June and in July 2017, KELLN caused approximately 1.79 million shares to be transferred to Wintercap in the names of three SHARP nominees.

91.     Between in or about May 2016 and on or about September 24, 2018, VELDHUIS or a co-conspirator used encrypted messages to cause Wintercap to sell more than 1.2 million STVF shares and more than nine million VBIO shares (on a post-split basis), generating more than $17 million in illicit proceeds.

92.     On or about February 10, 2017, SEXTON sent an xmail message to CC-4, with a copy to SHARP, requesting a wire transfer in the amount of $139,200 to a bank in the United States for an account associated with a mortgage loan servicer. SEXTON stated, "I need to make a lump sum payment to the mortgage for Palm Springs."

93.     Later in or about February 2017, Wintercap wired $139,200 to the mortgage loan servicer, which credited the payment against a mortgage in SEXTON's name. Wintercap debited the funds from the account of a SHARP nominee that had been selling VBIO shares in January and early February 2017.

94.     On or about November 22, 2017, SEXTON or a co-conspirator sent an xmail message to CC-4 requesting a wire transfer in the amount of $85,000 to a university foundation for CC-2's benefit, adding that the wire should be charged to the VBIO account in the Q system.

95.     That same day, CC-4 sent an xmail message to SHARP, requesting SHARP's approval of the wire to the university foundation. The following day, SHARP suggested that CC-4 change the format of the documentation supporting the wire request and then directed CC-4 to send the wire request to Wintercap.

96.     Later in or about November 2017, Wintercap wired $85,000 to the university foundation and debited the funds from a SHARP nominee's account.

97.     On or about November 6, 2017, VELDHUIS sent an xmail message to SEXTON, with a copy to CC-3, containing a draft article touting VBIO that was to be published on a financial news website. VELDHUIS wrote that the material needed "approval by you and the company before we can go live with the campaign."

98.     On or about November 7, 2017, SEXTON sent an xmail message to VELDHUIS, with a copy to CC-3, containing SEXTON's edits on the draft article.

99.     On or about August 9, 2018, VELDHUIS sent an xmail message to CC-3, stating that he "would like three emails written" on VBIO, which would become an "e-mail series." VELDHUIS explained that the first email should "Announce VBIO as the 2018 BioTech [Marijuana] pick of the year."

100.     On or about August 9, 2018, VELDHUIS sent an xmail message to CC-4, with a copy to SEXTON or a co-conspirator, requesting that a wire transfer in the amount of $50,000 be sent to a media company to pay for an advertising campaign, adding that the wire should be charged to the VBIO account in the Q system.

101.     On or about August 22, 2018 and August 23, 2018, CC-3 sent draft promotional emails to VELDHUIS and SEXTON, respectively, via xmail messages.

102.    On or about January 8, 2019, SEXTON or a co-conspirator sent an xmail message to SHARP and CC-4 requesting that a wire transfer in the amount of $50,000 be sent to MEDIA COMPANY 1, adding that the wire should be charged to the VBIO account in the Q system.

103.    On or about August 29, 2019, during sworn testimony to the SEC, CC-2 made multiple false and misleading statements for the purpose of concealing the scheme, including that CC-2 never received proceeds from the sale of VBIO shares and that he was unaware of anyone who had sold VBIO shares.

104.    Following CC-2's testimony, CC-2 conferred with SEXTON about payments sent to third parties on CC-2's behalf from the proceeds of the VELDHUIS Control Group's illicit stock sales.  SEXTON showed CC-2 a spreadsheet identifying hundreds of thousands of dollars of such payments.

105.    On or about July 30, 2020, during a second round of sworn testimony to the SEC, and for the purpose of concealing the scheme, CC-2 falsely testified that hundreds of thousands of dollars that had been distributed to a third party for the care of CC-2's daughter in 2016 and 2017 had been provided by SEXTON pursuant to a loan.  CC-2 also falsely testified that the $85,000 paid in November 2017 to a university foundation on behalf of CC-2 was a donation by SEXTON. In truth, the payments were distributions from CC-2's portion of the VELDHUIS Control Group's illicit stock sale proceeds.

## COUNT ONE
### Conspiracy to Commit Securities Fraud
### (18 U.S.C. § 371)

The Grand Jury charges:

106.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 70 of this Indictment.

107.    From in or about 2014 through in or about November 2018, in the District of Massachusetts and elsewhere, the defendants,

> (1) FREDERICK L. SHARP,
> (2) LUIS CARRILLO, and
> (5) COURTNEY M. KELLN,

conspired with others known and unknown to the Grand Jury to commit an offense against the United States, specifically securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, that is, to knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the SEC, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit in connection

30

with the purchase and sale of securities, to wit, shares of Pure Snax International Inc., Garmatex

Holdings, Ltd., and OneLife Technologies Corp., among others.

All in violation of Title 18, United States Code, Section 371.

<u>COUNT TWO</u>
Conspiracy to Commit Securities Fraud
(18 U.S.C. § 371)

The Grand Jury further charges:

108.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 31 and 71 through 105 of this Indictment.

109.    From in or about 2012 through in or about July 2020, in the District of Massachusetts and elsewhere, the defendants,

(1) FREDERICK L. SHARP,
(3) MIKE K.G. VELDHUIS,
(4) PAUL SEXTON, and
(5) COURTNEY M. KELLN,

conspired with others known and unknown to the Grand Jury to commit an offense against the United States, specifically securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, that is, to knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the SEC, by: (a) employing devices, schemes and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engaging in acts, practices and courses of business which would and did operate as a fraud and deceit in connection

with the purchase and sale of securities, to wit, shares of Vitality Biopharma, Inc. f/k/a Stevia First Corp., among others.

All in violation of Title 18, United States Code, Section 371.

COUNT THREE
Securities Fraud
(15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. §§ 240.10b-5; 18 U.S.C. § 2)

The Grand Jury further charges:

110.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 70 of this Indictment.

111.    From in or about 2014 through in or about November 2018, in the District of Massachusetts and elsewhere, the defendants,

(1) FREDERICK L. SHARP,
(2) LUIS CARRILLO, and
(5) COURTNEY M. KELLN,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the SEC, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, to wit, shares of Pure Snax International Inc., Garmatex Holdings, Ltd., and OneLife Technologies Corp., among others.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

<u>COUNT FOUR</u>
Securities Fraud
(15 U.S.C. §§ 78j(b) and 78ff(a); 17 C.F.R. §§ 240.10b-5; 18 U.S.C. § 2)

The Grand Jury further charges:

112.    The Grand Jury re-alleges and incorporates by reference paragraphs 1 through 31 and 71 through 105 of this Indictment.

113.    From in or about 2012 through in or about July 2020, in the District of Massachusetts and elsewhere, the defendants,

> (1) FREDERICK L. SHARP,
> (3) MIKE K.G. VELDHUIS,
> (4) PAUL SEXTON, and
> (5) COURTNEY M. KELLN,

did knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the SEC, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading, and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon any person in connection with the purchase and sale of securities, to wit, shares of Vitality Biopharma, Inc. f/k/a Stevia First Corp., among others.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a); Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.

35

FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

114.    Upon conviction of one or more of the offenses set forth in Counts One through Four, the defendants,

(1) FREDERICK L. SHARP,
(2) LUIS CARRILLO,
(3) MIKE K.G. VELDHUIS,
(4) PAUL SEXTON, and
(5) COURTNEY M. KELLN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

115.    If any of the property described in Paragraph 114, above, as being forfeitable pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), as a result of any act or omission of the defendant --

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the Court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 114 above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL

FOREPERSON

JAMES R. DRABICK
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF MASSACHUSETTS

District of Massachusetts: January  9 , 2024
Returned into the District Court by the Grand Jurors and filed.

/s/Douglas Warnock

DEPUTY CLERK       2:25 PM